IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ORLANDO ALEJANDRO-ORTÍZ, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>P.R. ELEC. POWER AUTH.,<br><br>Defendant. | CIV. NO.: 10-1320(SCC) |

## OPINION AND ORDER

Plaintiffs Orlando Alejandro-Ortíz and Sonia Rodríguez-Jiménez, as well as their minor children, have lived in Texas since this case's inception. This case was filed by Atty. David Efron, *see* Docket No. 1, and, with his sponsorship, Attys. Toby Fullmer and Douglas Matthews were admitted *pro hac vice. See* Docket Nos. 4, 5. Throughout the case's life, Toby Fullmer, David Efron, and other members of the Efron Law Firm, have filed on Plaintiffs' behalf. Efron and his firm tried the case, winning a substantial verdict.

On October 2, 2013, we, with the First Circuit's approval, entered an Order permitting execution of $1,000,000 of the judgment against PREPA. *See* Docket No. 422. Just a day later, Atty. Carlos Iguina-Oharriz filed a motion seeking leave to appear. *See* Docket No. 424. According to the motion, the Matthews & Fullmer Law Firm was counsel to Plaintiffs, and Efron had been hired by Matthews & Fullmer as local counsel; however, relations between Matthews & Fullmer and Efron, had broken down, Efron had been fired, and Attys. Iguina and Hatuey Infante (himself formerly of the Efron Law Firm) had been brought on as replacement local counsel. *See id.* The motion asked the Court to terminate Efron and his associates and allow Attys. Iguina and Infante to appear as new local counsel. *See id.* Efron quickly replied, asking the Court to disqualify the purported new local counsel, revoke the *pro hac vice* admissions of Fullmer and Matthews, and impose a lien in favor of his firm against any award of fees to Matthews & Fullmer. *See* Docket No. 426.

After reviewing these motions, we were troubled. Exhibits to the purported attorneys' filings showed that Plaintiffs had hired Matthews & Fullmer in 2009, Docket No. 425-2, at 5–6, and that Matthews & Fullmer had then hired the Efron Law

Firm in 2010 as local counsel. Matthews & Fullmer said that it had fired Efron on August 23, 2013, but on record was a subsequent revocation of the power of attorney in favor of Matthews & Fullmer, along with a new agreement, signed by Plaintiffs, hiring the Efron Law Firm as Plaintiffs' counsel. *See* Docket No. 426-4. Also on record was an October 2, 2013, revocation of that revocation, which purported to give power of attorney *back* to Matthews & Fullmer. *See* Docket No. 425-1, at 1–2. Along with these competing revocations were accusations on both sides that the other purported attorneys had coerced Plaintiffs into signing the various documents.

These last accusations were especially troubling given that trial evidence showed that lead Plaintiff Alejandro was mentally disabled and illiterate. We thus entered an order barring *all* of the attorneys purporting to act for Plaintiffs from communicating with Plaintiffs until such time that the Court was satisfied that it could determine who Plaintiffs actually wanted to represent them. Docket No. 427. We set a hearing, and in the meantime the undersigned twice personally spoke *ex parte* with Plaintiff Rodríguez in order to explain to her what was happening and ascertain Plaintiffs' wishes with regard to their representation.

A hearing was held on October 21, 2013. The Court decided that summonsing Plaintiffs would be overly burdensome to them, especially because their children had just started school in Texas; accordingly, only the attorneys—Efron, Fullmer, and Infante—were heard. Below, we lay out our findings based on that hearing.

## I.   The Hearing

Fullmer spoke first at the hearing. It was his position that problems between his firm and Efron's began in early 2013, when Efron began to act in a troubling manner in various cases where the two firms had joint representation agreements. He spoke first about *Aguayo-Cuevas v. PREPA*, No. 11-1907(FAB) (D.P.R. filed Sept. 15, 2011). In this case, Matthews & Fullmer had been retained by the plaintiff, who had moved to Tomball, Texas, after the events giving rise to her case.[1] Efron was hired as local counsel, and when the plaintiff, who apparently hated Texas, returned to Puerto Rico, Efron, with Matthews & Fullmer's permission, dismissed the federal case because jurisdiction had been destroyed. Later, in February 2013, Efron

---

**1.**   During the hearing, Efron stated that the *Aguayo-Cuevas* plaintiff had been "involuntarily" moved to Texas to establish diversity jurisdiction. He provided no basis for such a statement, and so we ignore it.

sent a letter to the plaintiff informing her that he would no longer represent her, *see* Docket No. 441-4; despite the fact that Efron was only acting as local counsel, Matthews & Fullmer—the firm hired by the plaintiff—was not first informed of Efron's decision. Indeed, Matthews & Fullmer did not learn of Efron's actions from Efron, but instead learned of them from a filing in the First Circuit. When Efron spoke, he denied none of this. Instead, he called the plaintiff "not a normal person" who "must be on some kind of pills"; she was unreliable and not a good plaintiff—not someone he wanted to represent.[2] So he fired her, without telling Matthews & Fullmer, causing her to bring her claims to another firm, and potentially causing Matthews & Fullmer to lose out on a fee. Matthews & Fullmer did not bring this issue up with Efron at the time, however.

In another case,[3] which had been referred to Matthews & Fullmer by another Puerto Rican attorney, Efron was again hired as local counsel. In this case, which was a medical

---

**2.** At the hearing, Fullmer defended the *Aguayo* plaintiff against Efron's ill-considered comments.

**3.** The parties referred to this as the *Vargas* case, but we are not sure of the case's full caption.

malpractice case that Efron would handle from the beginning, Efron and Matthews & Fullmer reached an agreement whereby Efron would collect 80% of the fee.[4] At some point, however, relations between Efron and the plaintiff broke down, and Efron wrote a letter to the plaintiff that the plaintiff found to be rude, leading him to call Matthews & Fullmer to complain. According to Efron, this letter was precipitated by unreasonable demands that the plaintiff was making. Again, Fullmer did not raise this issue with Efron at the time.

Most relevant were the problems in this case. Fullmer says that after PREPA filed its appeal, he began to get the impression that his firm was being shut out of the process. Fullmer asked for an opportunity to be involved in the appellate briefing, and Efron responded that his firm would take care of it and not to worry about it. Fullmer then asked for an opportunity to see the brief before it was filed, but the brief was filed without first being given to Fullmer, and Matthews & Fullmer

---

**4.** According to Fullmer, this was because it was a medical malpractice case, something that Efron, but not Matthews & Fullmer, had expertise in handling.

weren't even listed on the brief as counsel for Plaintiffs.[5] Again, Efron failed to deny the substance of this. By way of explanation for his decision not to allow Fullmer to participate in the brief writing, Efron essentially stated that he unilaterally decided that he was more qualified to write the brief. As to the failure to show the brief to Fullmer before it was filed, Efron said that it was done last minute and there was no time. When Fullmer responded that such a response was not heartening, Efron backtracked, saying that it wasn't done last minute, but that he had he had been so busy *formatting* the brief that he couldn't show it to Fullmer. Frankly, these explanations are unconvincing, and it does seem to us that Efron was attempting to cut out Matthews & Fullmer from the process at this point.

We are sure that all of this was cause for some concern at the Matthews & Fullmer firm, but, unsurprisingly, it seems that what *really* motivated this dispute was money. Specifically, who was going to collect the fees, and in what amounts. The

---

**5.**   Fullmer filed a notice of appearance before the First Circuit on December 18, 2012, but he was nonetheless not included as a signatory to the appellee's brief filed on April 17, 2013. *See Alejandro-Ortiz v. PREPA,* No. 12-2450 (1st Cir. filed Dec. 4, 2012).

joint venture agreement originally signed between the two firms here provided that Efron would be responsible for typical local counsel duties, for which he would be entitled to 20% of the fee. And when Plaintiffs settled with PREPA's insurer, Efron did receive a portion in such an amount. However, it seems that not long before trial in this case, Fullmer informed Efron that he could not attend trial because of conflicts, and so Efron would have to try the case. Around that same time, Fullmer and Efron entered into new discussions regarding the fee arrangement, with Efron seeking a larger fee because of his increased duties. Fullmer admits that such discussions took place but says that Efron was adamant that the proportions be reversed, with Efron receiving 80%, something to which Fullmer says he could not agree. Fullmer claims that he tentatitvely offered other arrangements but that Efron rejected them all and no agreement was reached. Certainly, no new written contract was ever executed between the two firms.

In one of his filings, Efron claimed that he and Matthews & Fullmer had "expressed[6] and verbally agreed, not in writing" that Efron "would keep 80% of the legal fee of" the trial

---

**6.**   We assume that Efron meant "expressly."

portion of the case. Docket No. 426, at 2. At the hearing, however, Efron was substantially more evasive about the actual content of this "agreement." Though asked about the matter directly several times, Efron refused to state, as he had in his motion, that he and Fullmer had "expressly" agreed to an 80-20 split. Instead, he referred vaguely to "the lion's share" and arrangements in other cases, such as the *Vargas* case, and at one point he stated that the agreement was "implicit." He wished the Court to assume that, because he had tried the case, the contract must have been altered, but he was unable to directly state the division to which Matthews & Fullmer had "expressly" agreed. Given his hedging during the hearing, we cannot help but conclude that Efron's comments in his motion about an express verbal contract were meant to mislead the Court.

Though we believe there was probably an intention at some point to adjust the fee upwards, we simply do not believe that Efron and Matthews & Fullmer would enter into a verbal contract on such an important matter. If an agreement had been reached, it would have been written down; Efron's statement that he did not ask for the agreement in writing because he "trusted" Fullmer is not credible or believ-

able—both attorneys seem sufficiently competent not to have acted in such a manner. We find that no new agreement was ever reached regarding fees.

Money is also at the heart of the other reason that Efron says Matthews & Fullmer terminated him. According to Efron, the dispute between the two firms really began in May 2013, when Efron was served with a local garnishment order from creditors of the Matthews Law Firm.[7] According to Efron, this order meant that after any judgment was distributed to him, he would have to pay Matthews & Fullmer's portion to the judgment creditor, rather than to the law firm. Efron says, further, that he was fired so that Matthews & Fullmer could avoid this garnishment order by hiring new local counsel not covered by it. Efron could not explain why the new local counsel would not also be quickly served with the order, nor did he explain why, if Matthews & Fullmer wished to avoid the garnishment order, it would hire as its new local counsel Atty. Infante, who was well aware of the order, having defended Matthews & Fullmer against it in state court when he worked for Efron's firm. Though we are sure Matthews &

---

**7.**   Apparently a predecessor to the Matthews & Fullmer Law Firm which still retains an interest in this case.

Fullmer is quite unhappy about the garnishment order, we are unconvinced by Efron's argument that it led to the termination of the Efron law firm.

As to the matter of the competing revocations and communications with Plaintiffs, both Fullmer and Efron spoke at length of their good relationships with Plaintiffs. In his motions, Efron hung his hat on the fact that Plaintiffs "speak little or no English." Docket No. 426, at 2. This was both evidence for why his firm's relationship with Plaintiffs was much stronger than Fullmer's and for why Fullmer must have been coercing and misleading Plaintiffs by having them sign English-language documents. At the hearing, however, Fullmer stated that Sonia Rodríguez, through whom everyone (including the undersigned) seems to communicate with Plaintiffs, speaks good English—a fact that is confirmed by Efron's own evidence, namely the records of the English-language text messages exchanged by Rodríguez and one of his associates. Again, we are forced to conclude that Efron was purposefully misleading the Court by making these statements. But as we have said, we do not wish to put Plaintiffs through the burden of a formal hearing, and so, though we are suspicious about the many documents, we cannot conclude

that either Efron or Fullmer did anything untoward with respect to Plaintiffs. We find, moreover, that Plaintiffs had good relationships with both firms, and trusted both.

Twice, the undersigned spoke personally with Rodríguez, and our distinct impression was that she was confused by the back-and-forth between the firms, not to mention the differences between who was her attorney and who was local counsel. Moreover, once it became clear that there was a dispute between the firms, she felt pressure from both sides—family members were called and her mother suffered a nervous breakdown—and was afraid that she would be sued by whoever Plaintiffs did not choose. The Court explained to Rodríguez the dispute that was ongoing and why the order barring the attorneys from speaking to her had been entered. The differences between local counsel and her chosen counsel were also explained, as were the consequences of any choice she made. After consulting with her husband, Rodríguez said that she recognized Fullmer as her attorney, and she pointed to the contract that she had originally signed with him. When asked who she wanted as her attorney going forward, she again asked for Fullmer. It was apparent that Rodríguez felt a loyalty to Fullmer under the contract, even though she was

very appreciative of the work Efron and his associate, Joanne González, had done on her behalf. But despite that work, she sees Fullmer as her attorney. The Court explained that if she determined that Fullmer were her attorney, Efron and his firm would most likely cease to work on the case. Rodríguez indicated that this was fine with her, and she further stated that she had no problem with Infante representing Plaintiffs as local counsel going forward.

## II. Analysis

First of all, based on Rodríguez's statements to the Court, we conclude that regardless of the interceding documents and disputes, Matthews & Fullmer shall remain Plaintiffs' counsel. Accordingly, Attys. Infante's and Iguina's motion to appear as substitute local counsel, Docket No. 424, is GRANTED. The clerk shall add each to this case and terminate the participation of Efron and his associates. Likewise, Efron's motion to disqualify the new local counsel and the "unauthorized stateside counsel," Docket No. 426, is DENIED insofar as it seeks that relief. Although we note the orders from Judges Besosa and Casellas, we will not disqualify Matthews & Fullmer at this late stage; if Efron is withdrawing his *pro hac vice* sponsorship of Matthews and Fullmer, we will consider

Iguina and Infante as substitute sponsors. As to allegations that Infante has a conflict that should prevent him from representing Plaintiffs, Efron's position in this regard has not been well explained and is rejected. Finally, Efron and his associates are reminded that Rule 4.2 of the Model Rules of Professional Conduct, which apply to attorneys in this district, prohibit them from communicating with persons they know to be represented by counsel. With the entry of this Order, Efron's relationship with Plaintiffs is deemed terminated; going forward, any communications between his firm and Plaintiffs must be with the prior consent of this Court or Matthews & Fullmer.[8]

Turning to the matter of fees,[9] we will first of all maintain

---

**8.** Of course, Efron is currently designated to argue on behalf of Plaintiffs before the First Circuit. How to deal with that matter is between Efron, Matthews & Fullmer, and the Court of Appeals. However, a copy of this order will be forwarded to the First Circuit so that it may be apprised of this case's developments.

**9.** The proper division of fees in this case was brought up for the first time in one of Efron's motions, in which he asked the Court to plaec a lien in his favor on 80% of the attorney's fees in this case. Docket No. 426, at 7. However, at the hearing, Efron expressed surprise when the Court asked about this matter. Nonetheless, we consider this matter before the Court on the attorneys' agreement, as it was raised by Efron and Matthews & Fullmer has interposed no objection to our considering it,

our instruction that any payments by PREPA in satisfaction of
the judgment shall be made into the Court's registry. More-
over, we find that the only fee contract between Efron and
Matthews & Fullmer was the joint venture agreement setting
an 80-20 split in favor of Matthews & Fullmer. The question is
whether that arrangement is valid. Though neither set of
attorneys has addressed the question, we believe we have
jurisdiction over this dispute. As a general matter, a district
court has jurisdiction over collateral matters such as claims for
attorney's fees. *See, e.g.*, *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d
220, 225 (2d Cir. 2004). Awards and distributions of fees are
governed by equitable principles, and courts routinely divide
awards among the different attorneys working for a case on
the plaintiff's behalf. In certain cases, this even means altering
the terms of a contract between the plaintiff and his attorney.
*See, e.g.*, *Karim v. Finch Shipping Co.*, 374 F.3d 302, 312 (5th Cir.
2004) (holding that a court sitting in admiralty may, in certain
circumstances, alter a contingent fee contract); *see also In re
Vioxx Prods. Liability Litig.*, 650 F. Supp. 2d 549, 559–60 (E.D. La.
2009) (noting that courts have nearly unanimously held that

---

instead arguing only as to the question's substance.

they have an inherent power to look into the reasonableness of contingent fee contracts). More to the point, in the context of class actions, courts regularly manage the distribution of fees among various attorneys from funds set up to benefit the plaintiffs. *See, e.g., Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988) (noting that in such cases, the "court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications."); *see also In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1017 (5th Cir. 1977) ("The power of the court to order compensation, *and the payment of it in the manner directed in this case*, is reinforced by the body of law concerning the inherent equitable power of a trial court to allow counsel fees and litigation expenses out of the proceeds of a fund that has been created, increased or protected by successful litigation." (emphasis added)). These cases talk about the fairness to parties *and* attorneys. *See In re Air Crash Disaster*, 549 F.2d at 1017–18 (discussing cases). The situation here is analogous. PREPA will pay $1,000,000 into the Court's registry, and we will become the fiduciary for those funds, something that will require us to divide it equitably and reasonably between both Plaintiffs and their attorneys as well

as among the attorneys themselves. By deciding this matter now, as the money is disbursed, rather than forcing the attorneys into another lawsuit, saves substantial time and resources, both for the attorneys and for the courts as a whole.

The joint venture agreement entered into by Efron and Matthews & Fullmer contemplated Efron performing only "local counsel duties," which were defined as

> transportation; filing of the initial Complaint and service on the Defendants; obtaining admissions *pro hac vice* for W. Douglas Matthews and Toby B. Fullmer int his case; providing office space and/or conference facilities for lead counsel as needed; assisting lead counsel at hearings, conferences and depositions in this case; providing assistance with the interpretation of local rules and laws; research of the law; facilitating communications with the Court and its personnel; taking depositions in this case when lead counsel is not available; and any other service which is in the best interests of the lawsuit and the clients.

Thus, although the contract did contemplate certain substantive—and even solo—work on the part of Efron and his firm, it is obvious that Matthews & Fullmer—the lead counsel—were intending to handle the bulk of the case, including trial (which goes unmentioned among Efron's duties). That this

was the firms' intention is confirmed by the fact that Fullmer
was willing to bargain a new fee arrangement with Efron after
it was determined that Efron would try the case. What this
means, then, is that Efron performed work beyond that
contemplated by the contract between himself and Matthews
& Fullmer—and significant work, given the burdens of trial.
We find, therefore, that the fee division should be modified
somewhat on a *quantum meruit* basis. *See, e.g.*, *Perez-Marrero v.
Colegio de Cirujanos Dentistas de P.R.*, 131 P.R. Dec. 545, 556
(1992) (discussing the *quantum meruit* doctrine in the context of
attorney's fees).

Though Efron asks for 80% of the fee, we think that this is
patently unreasonable. In the only joint-representation case in
which he had such an agreement, Efron seems to have borne
responsibility for the entire case. Here, by contrast, Matthews
& Fullmer participated to a significant degree throughout the
case's life, from its inception up until trial, including by
preparing and filing motions and securing experts. More
importantly, it was Matthews & Fullmer that bore all of the
financial risks in this litigation. It is exactly this risk—"the risk
of receiving no compensation for [an attorney's] efforts,"
despite substantial costs—that justify large contingency fees of

the sort to be awarded in this case. *See Boston & Me. Corp. v. Sheehan, Finney, Bass & Green, P.A.*, 778 F.2d 890, 897 (1st Cir. 1985). Of course, Efron's firm also ran the risk of not being compensated for its time spent on this case, but its exposure was much less significant given that it would not then have been also responsible for the expert fees and other litigation costs necessary to try this case for three years. Given these circumstances, we find that a 40% portion of the fee would compensate Efron for the additional expenses and burdens that came with trying the case while leaving Matthews & Fullmer fairly compensated for the financial risks it took in prosecuting this case.

## III.    Conclusion

We are disheartened by having had this matter before us. Because of a dispute between attorneys over fees, a particularly vulnerable set of plaintiffs has been annoyed, harassed, confused, and perhaps even coerced or lied to. We are unable at this juncture to discover the scope of such misconduct, but we suspect it is there, and we find neither Matthews & Fullmer nor Efron to be blameless. This Court, moreover, has been forced to waste its time with a dispute that should have never come this far, and, worse, in the process it has had to contend

with misrepresentations and histrionics. At this moment, we will enter no sanctions against any of the participants in this saga; however, should new information come to light, we reserve the right to refer any bad actors to disciplinary proceedings.

Matthews & Fullmer shall remain Plaintiffs' attorneys, sponsored and assisted by local counsel Attys. Infante and Iguina. The Efron Law Firm no longer represents Plaintiffs, and it should not communicate with them without the express consent of this Court or Matthews & Fullmer. A copy of this order will be sent to the First Circuit. The fee arrangement between Matthews & Fullmer and the Efron Law Firm is modified such that Matthews & Fullmer shall receive 60% of the fee award while the Efron Law Firm shall receive 40%. Once PREPA deposits funds in the Court's registry, they will be distributed to the various interested parties consistent with this Order.[10]

IT IS SO ORDERED.

---

**10.** The several motions in compliance and informative motions submitted with regard to this dispute, Docket Nos. 428, 429, 432, 433, are NOTED. Efron's motion to strike, Docket No. 431, is DENIED, as is his motion seeking an attorney's fees lien, Docket No. 426.

In San Juan, Puerto Rico, this 23rd day of October, 2013.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE